# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 28, 2004 Session

## STATE OF TENNESSEE v. GREG HARRIS

### Appeal from the Criminal Court for Sullivan County
### No. S46,640    R. Jerry Beck, Judge

### No. E2003-02834-CCA-R3-CD - Filed February 23, 2005

A Sullivan County Criminal Court jury convicted the defendant, Greg Harris, of criminal conspiracy to sell or deliver more than 300 grams of cocaine, a Class A felony; possession of more than 300 grams of cocaine for resale within 1000 feet of a school, a Class A felony; and two counts of possession of drug paraphernalia, a Class A misdemeanor. The trial court sentenced him as a Range I, standard offender to consecutive sentences of twenty-five years for each felony conviction, and concurrent sentences of eleven months, twenty-nine days for each misdemeanor conviction, for an effective sentence of fifty years. The jury fined him a total of $1,005,000. The defendant appeals, claiming that (1) the trial court erred by denying his motion to suppress evidence; (2) the evidence is insufficient to support his convictions; (3) the trial court erred by admitting irrelevant evidence and allowing prosecutorial misconduct without declaring a mistrial; (4) the jury verdict lacked unanimity because the state failed to elect either sale or delivery in count one of the indictment; (5) his right to a fair trial was violated by the fact he lacked certain materials necessary to prepare for trial, i.e., a map depicting the area surrounding the location of his arrest, a transcript of the suppression hearing, and a list of potential jurors; and (6) the trial court erred by imposing excessive and consecutive sentences. We affirm the defendant's convictions. However, we hold the record is insufficient to justify the trial court's imposition of consecutive sentences and, in light of the rule announced in Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), we modify the defendant's sentences to twenty-four years for each felony conviction.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part; Sentences Modified

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

Barbara W. Clark, Knoxville, Tennessee (on appeal), Greg Harris, Pro Se (at trial), William B. Lawson, Erwin, Tennessee (advisory counsel at trial), for the appellant, Greg Harris.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's arrest in a Kingsport apartment where police officers discovered 589.6 grams of cocaine. The police officers went to Charles Miller's apartment because they had capiases to arrest him and the defendant. During the arrest, one of the officers observed a Mason jar in the kitchen sink and a white substance, which he believed was cocaine, in the jar. The officers removed Mr. Miller and the defendant from the apartment and obtained a search warrant based on this observation and on information received from an informant. The trial court subsequently denied the defendant's motion to suppress the 589.6 grams of cocaine and the various items of drug paraphernalia that were seized. Before trial, the defendant requested that he be allowed to represent himself. After a brief colloquy, the trial court granted the defendant's request and appointed advisory counsel.

At the trial, Kingsport Police Officer Burke Murray testified that he participated in the defendant's arrest at approximately 6:00 a.m. on April 24, 2002. He said that when he arrived at the apartment with a group of other officers, he knocked and announced their presence very loudly. He said that he repeated the announcement at least three times and that he heard movement inside the apartment afterward. He said that about one minute later, Charles Miller opened the door. He said he recognized Mr. Miller, took him to the ground, and placed handcuffs on him while two other officers handcuffed the defendant and placed him on the ground alongside Mr. Miller. He said that when the officers entered the apartment, the defendant was lying on the couch and appeared to be sleeping. On cross-examination, Officer Murray denied that the officers kicked in the door to Mr. Miller's apartment.

Tennessee Bureau of Investigation (TBI) Agent Ken Rhodes testified that his job was to investigate narcotics violations and that he was part of the law enforcement team that arrested the defendant and Mr. Miller. He said that when he and the other officers arrived at the apartment, they knocked and announced their presence and, receiving no immediate response, they banged on the door again several times and yelled, "Police. Come to the door." He said that when Mr. Miller opened the door, Officer Murray arrested him and placed him on the ground. Agent Rhodes said that when he entered the apartment, the defendant was also on his way to the ground and wearing only his undershorts. He said that he searched the defendant's clothes for weapons before allowing him to get dressed and that he discovered some cash in the defendant's pants. He said he noticed a strong odor inside the apartment similar to that produced by "cooking cocaine," a scent with which he was familiar through job experience. He said he and the other officers conducted a protective sweep of the apartment for weapons, secured the premises, and waited for Agent Chambers to obtain a warrant to search the entire apartment. He said the apartment was very small and was furnished only with a couple of couches and an air mattress in the bedroom. He said that when Agent Chambers returned with a search warrant, he was assigned to search the bedroom and discovered part of a "cookie" in

the closet. He said "cookie" is a term used to describe the hard substance formed when powder cocaine is converted to crack cocaine. He said he also discovered some cash in a "Sprint PCS" box; two bags of white powder substance believed to be cocaine on the closet shelf and a third bag in the pocket of a coat; two small bags of what appeared to be crack cocaine in another coat pocket; a leather carry bag identified by an airport tag as belonging to Charles Miller, which contained a Glock 17 handgun and two cellular phones; and two airline boarding passes issued to Charles Miller, dated April 21, 2002, for flights from Dallas to Houston and from Houston to St. Louis. He said that two additional cellular phones were discovered on top of a stereo and explained that the possession of numerous cellular phones is significant because narcotics traffickers commonly use them to conduct business. On cross-examination, he testified that he did not observe drugs in the room where the defendant was sleeping on the couch and that he did not discover drugs when he searched the defendant's clothing.

Kingsport Police Detective Sean Chambers testified that he was assigned to the Vice and Narcotics Unit and that he assisted with the defendant's arrest. He said that when he entered the apartment, the defendant and Mr. Miller were already lying on the floor and that a third suspect, a female named Melissa Davis, was in the bedroom. He said that he detected an odor he associated with cocaine and that TBI Agent Bishop drew his attention to a Mason jar in the sink which contained a knife and some water. He said a white substance, which he believed to be crack cocaine, was floating in the water. He said the other officers secured the apartment while he obtained a search warrant. He said his tasks were to search the kitchen and collect evidence. He said he discovered two plastic bags containing white powder, four tan rocks he believed to be crack cocaine, a set of scales capable of measuring to tenths of a gram, a box of Mason jars, $200 in cash, and two receipts for money received by Mr. Miller from the defendant. He said he also found two airline ticket stubs in the defendant's name for flights dated April 21, 2002, from Dallas to Houston and Houston to St. Louis, with flight numbers matching those on the airline boarding passes belonging to Charles Miller. He said that after completing the search of the kitchen, he assisted the officers searching the living room where they discovered a title to a vehicle belonging to the defendant and additional cellular phones, making a total of seven phones found in the apartment. He said they recovered a total of $900 in cash. On cross-examination, Detective Chambers admitted that they did not send the Mason jar, the plastic bags, or the microwave oven to the crime laboratory for fingerprint identification.

Kingsport Police Officer Brian Bishop testified that he was assigned to the Second Judicial District Drug Task Force and had been involved in the investigation of the defendant. He said that because the defendant was on the floor being handcuffed when he entered the apartment, he walked to the right and stood behind the defendant. He said that from this vantage point he could see into the kitchen and also into the sink. He said that in the sink was a jar containing some water, a knife, and a white substance that he believed to be crack cocaine. He said that based on his training and experience, he knew Mason jars were commonly used to convert powder cocaine into "crack." He said the weight of the cocaine discovered at the Fuller Street apartment totaled 448.4 grams of powder and 147.6 grams of crack, and he estimated the quantity to have a street value of $66,000 to $67,000. On cross-examination, he estimated that he was standing ten to twelve feet from the sink

when he observed the Mason jar and said that the jar was within view from where he stood. He said that once he saw the jar, he walked closer to the sink. He explained that the jar was sitting toward the rear of the sink and admitted that the top of the jar was close to but did not rise above the edge of the sink. He said that based upon his experience, he was certain the white substance was crack cocaine and that he did not perform a field test.

Jacob White, a Geographic Systems Manager employed by the City of Kingsport, testified that his job was to produce maps. He said Detective Chambers requested that he prepare a map of the area surrounding the apartment at 1509 Fuller Street, where the defendant was arrested. He testified that the distance from 1509 Fuller Street to the property line of Dobyns-Bennett High School was approximately 550 feet.

Jacob White, a forensic scientist with the TBI Crime Laboratory in Knoxville, testified that he worked in the Drug Identification Section and that his duties included analyzing evidence to determine whether they contained controlled substances. He said that he analyzed the contents of the Mason jar and that it contained cocaine. He stated that he also analyzed the rock-shaped substances and the powder discovered in the apartment. He said three of the rocks weighed a total of 66.87 grams, a fourth rock weighed 2.01 grams, and the white powder contained in the plastic bags weighed 208.47 grams. He said that the rocks, in addition to the "cookies" submitted for testing, contained cocaine-base and that the powder contained cocaine, which totaled 68.8 grams of cocaine-base and 208.47 grams of cocaine. He said that other items seized from the apartment contained an additional 72.6 grams of cocaine-base and 239.8 grams of cocaine.

Charles Bernard Miller testified that he was a cocaine dealer before his arrest on April 24, 2002, and that he had not been arrested previously. He said that he met the defendant approximately five years ago in Ohio and that he came to Kingsport two and one-half years ago to sell cocaine. He said that he rented the apartment on Fuller Street approximately three months before his arrest and that the defendant had visited the apartment approximately three times. He said he drove from Dayton, Ohio to Ft. Worth, Texas with the defendant and a man named Antonio Howell in April 2002 to obtain a kilogram of cocaine for $16,000. He said that the purchase was the defendant's idea and that they both contributed the money but that the defendant was the custodian of the cash and handled the payment. He said that after the drug transaction was completed, he and the defendant "hung out" for a few days and then flew to Dayton, Ohio while Mr. Howell transported the drugs to Ohio by car. He said that shortly thereafter, he and the defendant drove to the apartment in Kingsport with Mr. Miller's girlfriend, Melissa Davis, and that Mr. Howell drove separately with the cocaine. He said a man named James Ashley showed up the next day to "cook" the cocaine, meaning to convert the powder cocaine to crack cocaine using baking soda, water, and heat from a microwave oven. He explained that they purchased the cocaine in powder form but that crack cocaine was easier to sell. He said that they noticed a problem with the cocaine in that it was not cooking properly and that they had intended to leave for Texas on the day they were arrested to return the cocaine to the drug dealer.

Mr. Miller testified that the defendant knew cocaine was present in the Fuller Street apartment, that the defendant had invested money for the purchase of the cocaine, that neither he nor the defendant used drugs, and that they expected to make approximately $30,000 from the sale of the cocaine in Kingsport. Mr. Miller said he had not been employed since approximately 1997 or 1998. He said that the defendant had worked as a barber in Steubenville, Ohio for a while but that he had not known the defendant to be employed in Kingsport. He admitted that he sold cocaine in half-ounce and full-ounce packages on the street but said that the defendant sold larger quantities and did not work the street. He said that during the past five years he and the defendant lived together twice and traveled back and forth to Ohio several times. He said that the seven cellular phones belonged to him, the defendant, and Mr. Howell and that they used them to make drug deals. He admitted the Mason jars were purchased to cook the cocaine. On cross-examination, Mr. Miller testified that he leased the Fuller Street apartment with Mr. Howell as co-lessee and that the defendant did not reside there. He said that his plea agreement with the state for a thirty-year sentence also stipulated that he testify truthfully. He said that "truthfully" meant "anything [he] could say to support the State's allegations to a conviction" but explained that he had no reason to lie. This concluded the proof.

## I. MOTION TO SUPPRESS

The defendant contends that the trial court should have granted his motion to suppress the evidence seized because the police officers' search of the Fuller Street apartment violated his rights under the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution. The defendant argues that the search warrant was invalid because (1) the affidavit did not provide sufficient information to establish either the veracity or reliability of the informant, and (2) the Mason jar was not in plain view. The state responds that the information provided by the affidavit sufficiently established both the informant's basis of knowledge and his reliability. The state further contends that because the Mason jar was in plain view from the officer's position and that position was lawful, the search was likewise valid under the "plain view" doctrine. We agree with the state.

The affidavit by Detective Chambers accompanying the search warrant states in pertinent part that

> Agent Nelson of the 2nd Judicial Task Force informed me that within the past seventy-two hours, a confidential and reliable informant has been to the apartment described above, which is the particular apartment to be searched. The Informant observed subjects Charles Miller and Greg Harris in process of turning powder cocaine into Crack cocaine by means of reduction using a microwave oven. The informant saw several bags of powder cocaine, which was poured into four to six glass jars, then water was added, and these jars were individually placed into the microwave oven for a period of time.

The informant estimated there to be one ounce of powder cocaine that was placed in each of the jars. When the contents of the jar turned into sludge like substance, the jars were removed and then stirred. The ending result of this process was Crack cocaine[.] The informant is personally familiar with the process of converting powder cocaine into crack cocaine.

According to Agent Nelson said confidential informant has proven to be reliable by providing information on the drug trade that has been corroborated by the law enforcement officers from the 2nd Judicial District Drug Task Force. This has been accomplished through the investigations, observations, and experience of said law enforcement officers. The confidential informant also provided names, drug types and weights, prices, and details of drug sales and events involving recent cases that Agent Nelson was personally involved in and therefore knew the information to be accurate. Further, said confidential informant, acting at the direction of agents of the 2nd Judicial District Drug Task Force, has in the past made purchases of controlled substances from Charles Miller. Said informant has also been found in possession of what was believed to be crack cocaine while co-operating with agents of the 2nd judicial drug task force as well as arrested in the past for possession of cocaine for resale. After his arrest the informant gave information concerning a large scale drug conspiracy that included Charles Miller and Greg Harris. Within the past two weeks the informant made a recorded phone call to Greg Harris in which Harris indicated that he was attempting to obtain cocaine out of state to bring into Kingsport, TN for distribution. Agent Nelson of the 2nd Judicial Drug Task Force has personally observed, within the past twenty four hours a vehicle he personally recognized as belonging to Greg Harris parked in the vicinity of the residence to be searched.

On 04-24-02 while assisting the 2nd Judicial Drug Task Force in the execution of an arrest warrant for Charles Miller, at 1509 Fuller Street Kingsport, TN, your affiant observed a small glass jar in the kitchen sink containing an off white substance believed to be crack cocaine. This information is consistent with the information given by the informant. Based upon your affiant's training as well as professional experience your affiant believes that the jar observed was used in the process of converting powder cocaine into crack cocaine and that the off white substance is crack cocaine.

Before evidence was presented at the suppression hearing, the trial court noted that the affidavit provided Detective Chambers' background training and his ability to identify drugs. It noted that the affidavit indicated the informant would be able to recognize cocaine and crack cocaine and that it complied with the requirements set forth in Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584 (1969), requiring the reliability of the informant to be "established in the four squares of the search warrant." The trial court found that the reliability of the informant was "over-established" and that Agent Nelson would have a presumption of reliability based upon the fact he was a police officer. In spite of its finding that the Aguilar-Spinelli test had been satisfied, the trial court agreed to hear evidence supporting the defendant's claim that the search warrant was constitutionally invalid based on the Mason jar not being in plain view.

Detective Chambers testified that he was present during the defendant's arrest and that the police officers gained entry into the apartment when Mr. Miller answered the door after the officers knocked and announced their presence. He said that Agent Bishop summoned him into the apartment, which was very small, and that the defendant was on the ground no more than ten feet from the kitchen sink. He said that he walked to the kitchen sink and observed the Mason jar at the direction of Agent Bishop, who had noticed it upon entering the apartment.

Agent Bishop testified that because the defendant was lying on the right-hand side of the floor when he entered the apartment, he veered right and stepped over and around the defendant. He said that this placed him "almost right behind" the officer who was handcuffing the defendant. He said that from this vantage point, he could see the Mason jar in the kitchen sink along with the knife and the white substance in the bottom of the jar. He said his position in the room was between the defendant and the sink but estimated that the officer who was handcuffing the defendant also would have been able to see the jar. He said he asked Detective Chambers to meet with Agent Nelson and apply for a search warrant.

At the conclusion of the hearing, the trial court found that assuming the officers' presence in the apartment was legal, "anything they saw in plain view would be fair game." Our review of the trial court's ruling concerning the validity of the search warrant shall include both issues: whether the information received from the confidential informant was sufficient to establish probable cause and whether the Mason jar was within plain view of the officer.

In reviewing the trial court's denial of a motion to suppress, we accept the trial court's findings of fact unless the evidence preponderates otherwise. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). However, the law as applied to those facts is subject to de novo review. Id. The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. State v. Odom, 928 S.W.2d 18, 22-23 (Tenn. 1996).

In Tennessee, a finding of probable cause supporting issuance of a search warrant must be based upon evidence included in a written and sworn affidavit. T.C.A. § 40-6-104; Tenn. R. Crim. P. 41(c); State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989). The affidavit must set forth facts

upon which a neutral and detached magistrate can find probable cause for issuing a search warrant. State v. Bryan, 769 S.W.2d 208, 210 (Tenn. 1989). In reviewing the validity of a search warrant, the reviewing court may consider only the information brought to the magistrate's attention. Jacumin, 778 S.W.2d at 432. The affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant. Id.; State v. Melson, 638 S.W.2d 342, 354 (Tenn. 1982).

## A. Confidential Informant

Our supreme court has held that probable cause based upon hearsay requires a showing (1) of the informant's basis of knowledge and (2) of either his credibility or the reliability of his information. Jacumin, 778 S.W.2d at 432, 436. While independent police corroboration can make up deficiencies in either prong, each must be separately considered and satisfied. Id. at 432.

With respect to the informant's basis of knowledge, the affidavit specifically alleged:

> The informant observed subjects Charles Miller and Greg Harris in process of turning powder cocaine into Crack cocaine by means of reduction using a microwave oven. The informant saw several bags of powder cocaine, which was poured into four or six glass jars, then water was added, and these jars were individually placed into the microwave for a period of time. The informant estimated there to be one ounce of powder cocaine that was placed in each of the jars. When the contents of the jar turned into sludge like substance, the jars were removed and then stirred. The ending result of this process was Crack cocaine[.]

The affidavit also alleged that the informant was personally familiar with the process of converting powdered cocaine to crack. We conclude that the personal observations and detailed descriptions of criminal activities provided by the informant are sufficient to satisfy the basis of the knowledge prong. Regarding the reliability prong, the affidavit alleged that the informant had provided information concerning the drug trade that had been corroborated by law enforcement officers through investigations, observations, and experience. Moreover, the informant had also provided names, drug types, weights, prices and other kinds of information and details of similar nature to Agent Nelson concerning recent cases which Agent Nelson said he knew to be accurate. We conclude that these allegations satisfy the reliability requirement. Probable cause to issue the search warrant existed based on the information received from the informant.

## B. Plain View

We also conclude that the law enforcement officers were entitled to seize the Mason jar and its contents pursuant to the plain view doctrine which allows for seizure when (1) the items are in plain view; (2) the viewer has the right to be in the position to view the items; and (3) the

incriminating nature of the items is immediately apparent. State v. Hawkins, 969 S.W.2d 936, 938 (Tenn. Crim. App. 1997). Agent Bishop testified that the Mason jar was in plain view from his position in the apartment. According to the testimony of Agent Rhodes and Detective Chambers, the apartment was very small, and, thus, it is reasonable to believe that a person could see into the kitchen and the sink from the adjoining room. The room was occupied by at least four adult males, two of them lying on the floor, when Agent Bishop entered the room and stepped to the right. According to the map of the apartment, Exhibit 2 at trial, this would place him at the entrance to the kitchen with a potentially unobstructed view of the sink. His participation in the lawful arrests gave him the right to be in this position, and, because of his training and experience with narcotics trafficking and the scent of cocaine cooking, the incriminating nature of the items in the sink was immediately apparent. The evidence does not preponderate against the trial court's finding that the jar was in plain view. We conclude that the Mason jar in plain view provided probable cause to search the remainder of the apartment.

## II. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to support his convictions because the state failed to prove he had actual or constructive possession of the cocaine or drug paraphernalia and also failed to prove the elements of conspiracy. He asserts that the Fuller Street apartment was not his residence and that no drugs were found in his possession or the area immediately surrounding him when he was arrested. The state responds that the evidence of the defendant's guilt is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not re-weigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

To convict the defendant of the cocaine possession offense, the state was required to prove that the defendant (1) knowingly possessed cocaine within 1000 feet of real property that comprised a public or private school, (2) with the intent to resell, and (3) the amount of the cocaine possessed exceeded 300 grams. T.C.A. §§ 39-17-417(j)(5), -432(b). With regard to the offense of possessing drug paraphernalia, the state was required to prove that the defendant (1) possessed with intent to use, (2) equipment, products, or materials, (3) intended or designed for use in manufacturing, compounding, converting, producing, processing, packing, storing, containing or concealing a controlled substance. T.C.A. §§ 39-17-402(12), -425(a)(1). The term "possession," as used in the statutes, embraces both actual and constructive possession. State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). "Constructive possession requires that a person knowingly have 'the power and intention at a given time to exercise dominion and control over an object, either directly

or through others.'" State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981) (quoting United States v. Craig, 522 F.2d 29 (6th Cir. 1975)).

Viewed in the light most favorable to the prosecution, the state proved beyond a reasonable doubt that the substance discovered in the Fuller Street apartment was cocaine, that the cocaine totaled more than 300 grams, that the amount was of sufficient quantity to conclude that the drugs were intended for sale and not personal use, and that the drugs were found within 1000 feet of a school. The state also proved that the glass jars, microwave, scales, and baggies found in the apartment were drug paraphernalia intended for use in converting or processing, and packing or storing the cocaine.

The record reflects that Mr. Miller testified that purchasing the cocaine was the defendant's plan, that the defendant invested money in the purchase, that they traveled to Texas for this purpose, and that they expected to make approximately $30,000 from cooking and selling the cocaine. The fact that the defendant did not lease the apartment or have the drugs on his person does not negate the culpability reflected by this testimony. However, we recognize that a conviction cannot be based solely upon the uncorroborated testimony of an accomplice and that other evidence, entirely independent from the accomplice's testimony, must establish the defendant's identity and lead to the inference that the defendant is implicated in the commission of the crime. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001). Mr. Miller's testimony is corroborated by the airline ticket passes in his and the defendant's name, the defendant's presence in the apartment, the strong odor of "cooking" cocaine present during the arrest, and the vast amount of cocaine and paraphernalia discovered in the apartment. This evidence, taken in the light most favorable to the state, is sufficient for the jury to have found beyond a reasonable doubt that the defendant possessed the cocaine and paraphernalia.

The offense of conspiracy is committed when two or more persons, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting to promote or facilitate commission of the offense, agree that one or more of them will engage in conduct constituting that offense. T.C.A. § 39-12-103(a). A conviction for criminal conspiracy to commit an offense also requires the state to prove that the defendant or another with whom the defendant conspired performed an overt act in pursuance of the conspiracy. T.C.A. § 39-12-103(d).

The evidence, taken in the light most favorable to the state, shows that the defendant and Mr. Miller, along with Mr. Howell, traveled from Ohio to Texas to purchase a kilogram of powder cocaine and that they transported it to Kingsport to sell, after converting the powder cocaine to the crack form of the drug. We conclude that this proof is sufficient for a rational jury to have found beyond a reasonable doubt that the defendant entered into an agreement to commit the crime, with one or more persons who shared criminal intent, and that at least one overt act was committed in furtherance of and pursuant to the criminal objectives of the conspiracy.

## III.  FAILURE TO EXCLUDE EVIDENCE AND DECLARE MISTRIAL

The defendant contends that the trial court erred by allowing the state to introduce the cocaine and other items discovered in the co-defendant's apartment as evidence.  He argues that because these things were not under his dominion and control, the evidence was irrelevant and the probative value was outweighed by the danger of unfair prejudice.  In addition, the defendant contends that the trial court erred by failing to declare a mistrial based upon the improper comments made by the prosecutor during closing argument.  The state responds that the evidence discovered in Mr. Miller's apartment was relevant to prove the possession and conspiracy charges.  The state also contends that the defendant waived any issue concerning the prosecutor's remarks by failing to object at the proper time and that the prosecutor's comments do not give rise to plain error.

### A.  Admissibility of Evidence

The standard of appellate review is abuse of discretion when the decision of the trial judge concerning admissibility of evidence is based on relevance.  See State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997). The trial court's decision to admit or exclude evidence will be overturned on appeal only where there is an abuse of that discretion.  Otis v. Cambridge Mut. Fire Ins. Co., 850 S.W.2d 439, 442 (Tenn. 1992).  Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  Under Rule 402, Tenn. R. Evid., relevant evidence is generally admissible.  However, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  See Tenn. R. Evid. 403.

The defendant was charged with conspiring with the co-defendant to sell or deliver cocaine and with possessing cocaine for resale.  The items in issue were discovered in the apartment where the defendant was an overnight guest, and they were relevant to show a connection between him and the co-defendant relative to the conspiracy and their actions in furtherance of their criminal objective.  Circumstantial evidence is relevant to show culpability and actual possession, i.e., dominion and control, is not necessary to prove possession for purposes of a conviction.

### B.  Prosecutorial Misconduct

The defendant contends that a statement in which the prosecutor urged the jury to convict the defendant to protect the community in which they lived and his comment that "[o]ur society has gotten too laxed [sic] in holding people responsible for their own actions" constituted language calculated to inflame the passion or prejudices of the jury.  He argues that the trial court erred by not declaring a mistrial based on these statements.

The record reflects that the defendant failed to object to the prosecutor's comments or move for a mistrial at the time the statements were made.  Consequently, he has waived consideration of this issue on appeal.  See T.R.A.P. 36(a).

## IV. VERDICT UNANIMITY

The defendant contends that the trial court should have required the state to elect between sale and delivery with respect to the conspiracy charge and that its failure to do so caused the jury's verdict to lack unanimity because it was based on two separate offenses. The state responds that election is not required in a charge of conspiracy to sell or deliver whereas only one conspiracy offense was charged and proven.

When the state charges a defendant with one offense but produces evidence of multiple offenses, the doctrine of election requires the state to elect the particular offense for which it seeks a conviction. State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same offense and set of facts. State v. Johnson, 53 S.W.3d 628, 631 (Tenn. 2001).

The record reflects that the issue whether the state should elect between sale and delivery was considered by the trial court, and it ruled that a unanimity instruction was not required. It subsequently instructed the jury without providing the jury a special verdict form distinguishing "sale" from "delivery." The trial court based its ruling primarily on State v. Lemacks, 996 S.W.2d 166 (Tenn. 1999), noting that the supreme court concluded no election or enhanced unanimity instruction was required under circumstances "very similar" to this case.

The defendant argues that the trial court's ruling conflicts with this court's decision in State v. Angela E. Isabell, No. M2002-00584-CCA-R3-CD, Lewis County (Tenn. Crim. App. June 27, 2003). In Isabell, the defendant was indicted on three separate counts of "sale or delivery" of a controlled substance. Each count involved a different controlled substance, and she was convicted of all three counts. This court concluded that the indictments impermissibly charged two separate offenses within a single count and reversed the convictions due to lack of unanimity in the verdict. See id. slip op. at 4.

In the defendant's case, the indictment for conspiracy did not charge two separate offenses but stated the following:

> The Grand Jurors for Sullivan County, Tennessee, . . . present that CHARLES B. MILLER, MELISSA NICOLE DAVIS, and GREG HARRIS, each being a party to the offense with each other and with other persons both in Tennessee and out of Tennessee whose names are to the Grand Jury unknown, from on or about April 22, 2002 to April 24, 2002, . . . did unlawfully, feloniously and knowingly conspire and agree that one or more of them would engage in conduct which constituted the offenses of sale and, or delivery of more than three hundred (300) grams of a substance containing Cocaine, a Schedule II Controlled Substance, and the said CHARLES

> B. MILLER, MELISSA NICOLE DAVIS, and GREG HARRIS did
> each intentionally act for the purpose of promoting or facilitating the
> commission of the said offenses and as a result of the conspiracy, an
> overt act was committed in furtherance of the conspiracy, to wit:
> CHARLES B. MILLER, MELISSA NICOLE DAVIS, and GREG
> HARRIS . . . did arrange for and procure the importation of over three
> hundred (300) grams of a substance containing Cocaine, a Schedule
> II Controlled Substance, into Sullivan County, Tennessee where it
> was sold or delivered or possessed with the intent to be sold or
> delivered contrary to T.C.A. §§ 39-17-417 and 39-12-103, a Class A
> felony, and against the peace and dignity of the State of Tennessee.

Criminal conspiracy is a single offense, and the statute provides that although a person may conspire to commit a number of offenses, he or she is guilty of only one conspiracy, so long as the multiple offenses are the object of the same agreement or continuous conspiratorial relationship. See T.C.A. § 39-12-103(c). By contrast, the legislature intended the manufacture, delivery, sale, and possession of controlled substances to be separate substantive offenses. See T.C.A. § 39-17-417, Sentencing Commission Comments. Consequently, the defendant's reliance on Isabell is misplaced.

The defendant also asserts that the jury rendered a verdict based upon several possible criminal acts, i.e., whether the defendant cooked the cocaine on one night, sold the crack cocaine on a different night, and delivered the crack cocaine during the period of time between April 22, 2002, and April 24, 2002. The record reflects that the evidence implicated the defendant in transporting, possessing and cooking cocaine. The jury convicted the defendant of possession with intent to sell or deliver more than 300 grams of cocaine and conspiracy to sell or deliver cocaine. The state was not required to prove and did not prove the substantive offenses of sale or delivery.

The defendant asserts that the state's failure to elect caused the trial court to be confused concerning the jury's verdict. He argues that the record is unclear "whether the jury's verdict was based on conspiracy to sell or deliver 300 grams of cocaine in Count I or possession of 300 grams of crack cocaine for resale as in Count II of the Indictment." He cites to a portion of the record where the trial court, the defendant, and the state discussed the trial court's earlier decision to forego providing the jury a special verdict form. This discussion occurred before the jury deliberated on the case. Our review of the record reveals nothing to indicate the trial court was confused regarding the convicted offenses or the jury's verdict. This issue has no merit.

The defendant asserts that the trial court instructed the jury that to find him guilty, it had to find beyond a reasonable doubt that he sold or delivered the controlled substance. He contends that the verdict forms reflect that the jury found him "guilty of sale or delivery." He cites a portion of the record where the trial court instructs the jury concerning the possession of cocaine offense, and it does not contain the language quoted by the defendant. We have reviewed the jury instructions relating to the conspiracy and possession offenses and conclude that no error occurred. The verdict forms were not included in the record. This issue has no merit.

In sum, we conclude that prosecuting the defendant for criminal conspiracy to sell or deliver more than 300 grams of cocaine did not risk different jurors basing their individual determinations on different sets of facts. Thus, the verdict did not lack unanimity. "When the evidence does not establish that multiple offenses have been committed . . . the need to make an election never arises." State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000). The conspiracy charge in the present case stems from the relationship between Mr. Miller and the defendant and their concerted actions in securing or processing the kilogram of cocaine. The jury was not required to make findings from multiple criminal acts or determine if the defendant was guilty of the sale or delivery of cocaine. Therefore, the trial court did not err by failing to require the state to elect as to whether the defendant was conspiring to sell or deliver cocaine.

## V.  LACK OF MATERIALS

The defendant contends that his right to a fair trial was violated by (1) his failure to receive in a timely manner a map depicting the area surrounding the Fuller Street apartment, (2) his late receipt of a copy of the transcript of the suppression hearing, and (3) the fact that he was given an incomplete list of potential jurors for voir dire. The state responds that it complied with the rules governing discovery concerning the map and that the defendant has not demonstrated any prejudice resulting from the untimely receipt of the transcript or list of potential jurors.

### A.  Map

Decisions with regard to pre-trial discovery matters generally rest within the sound discretion of the trial court, and its decision shall not be reversed unless a clear abuse of discretion is demonstrated. Benton v. Snyder, 825 S.W.2d 409, 416 (Tenn. 1992). Regarding the failure to comply with discovery requirements, Rule 16(d)(2), Tenn. R. Crim. P., states:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place, and manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

The defendant contends that he was prejudiced by the state's failure to supply him with a map of the area surrounding the Fuller Street apartment because the map was critical to prove that the apartment was not located within 1000 feet of a school. The state asserts that it complied with the rules governing discovery and delivered the map to the defendant before trial. The state argues that the defendant did not request the trial court to exclude the exhibit or grant a continuance and that he failed to demonstrate prejudice.

The record reflects that on December 9, 2002, the day the jury was selected and sworn, the trial court ordered that the defendant be provided with a map. The state contends the defendant did not request that the trial court exclude the map, but the record reflects that the defendant filed a motion in limine on December 3, 2002, requesting that the trial court exclude the school zone chart based on the state's failure to comply with the rules of discovery. However, the appellate record does not contain the trial court's ruling on the motion or reflect that the defendant requested a continuance. We conclude that the defendant's receiving the map on the day his trial began was sufficient compliance with Rule 16 and that he failed to demonstrate how receiving the map at this time prejudiced his case.

## B.  Suppression Hearing Transcript

The defendant claims that he required the suppression hearing transcript for proper cross-examination of the state's witnesses who testified at the hearing. The state replies that the defendant did not request a copy until November 22, 2002, seventeen days before trial, and that he was provided with a copy on the day before any proof was presented. The state argues that he did not show how the lack of the transcript at an earlier date prejudiced his case.

The record reflects that the trial court ordered that the defendant be provided with a copy of the transcript on December 9, 2002. The trial court noted that because the defendant was present at the suppression hearing, the transcript did not contain any information of which he was unaware and, thus, untimely receipt of the transcript would not prejudice his case. Because the defendant has not demonstrated prejudice or how lack of the transcript at an earlier date rendered the trial unfair, we conclude that the trial court did not abuse its discretion.

## C.  List of Prospective Jurors

With regard to the list, the defendant relies upon Tenn. R. Crim. P. 24(g) which provides:

> Upon request the parties shall be furnished with a list of members of the jury panel, containing the following information with respect to each: name, address, occupation, name of spouse, occupation of spouse. The list shall also state whether each prospective juror has previously served on a criminal court jury; however, that information need not be provided prior to the day of trial.

The defendant acknowledges that he received a list on the first day of trial before voir dire was conducted but complains that the list contained only names. He also admits that he questioned the prospective jurors and that he did not ask questions concerning their occupation, spouse, spouse's occupation, or previous jury service, but he claims that he was prejudiced by "nondisclosure." We decline to grant relief for prejudice resulting from nondisclosure of information he could have acquired through questioning. The record reflects that the defendant did not object or request that voir dire be postponed when he received the list. He does not state either why he did not inquire as

to the occupations of the prospective jurors or their spouses or how having an incomplete list prejudiced his case. We conclude that receiving an incomplete list on the first day of trial did not prejudice the defendant.

## VI. SENTENCING

The defendant contends that the trial court erred by (1) rejecting applicable statutory mitigating factors and improperly applying enhancement factors; (2) requiring him to serve the full minimum sentence, fifteen years without sentence reduction credits, pursuant to T.C.A. § 39-17-432; and (3) ordering consecutive sentences. The state contends that the trial court properly sentenced the defendant. Because the trial court applied one enhancement factor using findings of fact not inherent in the jury's decision or admitted by the defendant, we conclude that it violated the defendant's Sixth Amendment right to jury trial and reduce the defendant's sentences from twenty-five to twenty-four years for each felony conviction. We further conclude that T.C.A. § 39-17-432 applies to the defendant's sentence for drug possession but that the record does not support consecutive sentencing. We therefore reverse the trial court's judgment concerning consecutive sentencing and order the defendant's sentences to run concurrently.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994). Because the trial court's findings of fact concerning one enhancement factor and the imposition of consecutive sentences are not adequately supported by the record, the standard for our review of the defendant's sentencing is de novo without a presumption of correctness.

The presumptive sentence to be imposed is the midpoint of the range for a Class A felony if there are no enhancement or mitigating factors. T.C.A. § 40-35-210(c). Our sentencing act provides that, procedurally, the trial court is to increase the sentence within the range based on the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

## A. Application of Enhancement and Mitigating Factors

The defendant contends that the trial court erred when it applied two enhancement factors based upon facts not submitted to the jury and by rejecting applicable mitigating factors. The state contends that the trial court properly sentenced the defendant. We conclude that only enhancement factor (2) and no mitigating factors applied in this case. Because the trial court's use of one enhancement factor violated Blakely, we reduce the defendant's sentences accordingly.

The state introduced the defendant's presentence report into evidence at the sentencing hearing. No witnesses testified. The trial court found that two enhancement factors applied to both felony convictions: (2), the defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range; and (3), the defendant was a leader in the commission of an offense involving two or more criminal actors. See T.C.A. § 40-35-114(2), (3). The trial court applied enhancement factor (2) based upon proof of one prior conviction in Ohio in October 1989. In applying enhancement factor (3), the trial court found the defendant was "one of the movers and shakers or leaders" in the commission of the offense, which it noted was an "elaborate-type crime" involving planning and travel to other states.

The defendant presented three mitigating factors for consideration by the trial court: (1) that his criminal conduct neither caused nor threatened serious bodily injury; (2) that he acted under strong provocation; and (11) that although guilty of the crime, he committed the offense under such unusual circumstances that it is unlikely a sustained intent to violate the law motivated his criminal conduct. T.C.A. § 40-35-113(1), (2), (11). The trial court rejected all three mitigating factors.

With regard to enhancement factors, we hold that the trial court's use of enhancement factor (2) was proper but that application of enhancement factor (3) violated Blakely. In Blakely, the

United States Supreme Court held that the Sixth Amendment guarantee to jury trial encompassed the right to have a jury determine all essential facts necessary for the imposition of sentencing. See Blakely, 542 U.S. at __, 124 S. Ct. at 2537. The Court explained,

> Our precedents make clear, however, that the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Id. (citations omitted).

Thus, the only factor which applies without offending Blakely is factor (2), based upon the defendant's prior conviction in Ohio involving cocaine. See id. at ___, 124 S. Ct. at 2537. Blakely prohibits the application of enhancement factor (3) because it relies upon the trial court's finding the defendant was a leader in the commission of an offense involving two or more criminal actors. This finding, made solely by the court, violated the defendant's right to have a jury determine all the essential facts necessary to the imposition of punishment. We hold that in so doing, the trial court adversely affected a substantial right of the defendant–the right to trial by jury. In our de novo review and determination of appropriate enhancement factors, we are likewise prohibited from violating Blakely. See State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, White County, slip op. at 26 (Tenn. Crim. App. Nov. 30, 2004).

The defendant contends that the trial court also erred by rejecting mitigating factors (1), (2) and (11), but his brief only presents an argument concerning factor (11) which he asserts was error under State v. Ross, 49 S.W.3d 833 (Tenn. 2001). With respect to this mitigating factor, the court in Ross stated:

> By its plain language, the section 40-35-113(1) mitigating factor focuses not on the circumstances of the crime committed by a defendant as do many of the other mitigating and enhancing factors. Rather, this factor focuses upon the defendant's conduct in committing the crime. Although cocaine itself may well be, in the words of the trial court, an "inherently addictive and dangerous substance," this fact alone says nothing about the appellant's criminal conduct, which was constructive possession of the substance located in a room several doors down from where the officers initially found the appellant. Moreover, we see no evidence in the record that the

-18-

appellant actually sold or attempted to sell the drug at the time of the offense. Had either of these circumstances been present, then the dangerous nature of the drug, combined with the dangerous nature of many drug transactions, may have indeed supported the trial court's rejection of this factor as constituting a threat of serious bodily injury. As it was, however, the appellant's presence down the hall from the substance cannot be said to have threatened serious bodily injury to any person.

Id. at 848. Noting that the decisions of this court have split on whether this mitigating factor is applicable in cases involving drug offenses, the court in Ross declined to analyze or distinguish them, concluding that when "the conviction for possession is based only upon constructive possession, and the threat of serious bodily injury is more conceptual than real, little justification exists in having a per se rule that excludes consideration of this mitigating factor" and that doing so to an entire class of offenses which do not inherently involve serious bodily injury "undermines the notion of individualized sentencing that underlies the 1989 Criminal Sentencing Reform Act." Id. at 848-49. In rejecting a per se rule, the court noted that the factor should not be given any special significance.

We conclude that mitigating factor (1) does not apply in the defendant's case. We believe the great quantity of drugs discovered and their proximity to a school zone threatens serious bodily injury and distinguishes this case from Ross, in which the defendant possessed 53.5 grams of cocaine. Because the defendant did not present an argument concerning mitigating factors (2) and (11), we do not address their application. See T.R.A.P. 27(a)(7).

Upon de novo review, the only enhancement factor which we may apply without offending Blakely is factor (2). No mitigating factors apply. The record does not reflect what weight the trial court attributed enhancement factor (2). The trial court stated only that

The lack of statutory mitigating factors and the heavy abundance of statutory enhancing factors and considering that pursuant to law, I must start with a . . . midpoint sentencing under T.C.A. 40-35-210(d), the Court finds that the appropriate sentence, considering the mitigators and considering starting at the midpoint sentencing, should be twenty-five years.

We conclude that enhancement factor (2) deserves significant weight because it is a similar offense and a "felony of the first degree" for "Aggravated Trafficking Sale of Cocaine." We reduce the defendant's sentences from twenty-five to twenty-four years for the convictions of conspiracy and possession of cocaine.

-19-

**B. School Zone Statute**

The defendant also contends that the trial court erred by requiring him to serve the full minimum sentence, fifteen years without sentence reduction credits, pursuant to T.C.A. § 39-17-432. He argues that the evidence was insufficient to find he committed the offense within 1000 feet of school property and that he was not the owner, possessor or in control of the premises where the drugs were discovered. In addition, he contends that the state failed to prove the cartographer was qualified to testify as an expert concerning the proximity of the school to the apartment. We note that because proximity to the school zone is an element of the offense of which the jury convicted the defendant, this issue actually relates to sufficiency of the evidence, but we shall address it here.

As for the defendant's argument concerning ownership or control of the premises, his brief cites no reasons or authority for his contention that a conviction cannot stand for drug possession when the accused is arrested on premises he does not own or control. We know of none and conclude that the issue is without merit.

Regarding the qualifications of Jacob White, who testified as an expert witness, we observe that questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257, 263-264 (Tenn. 1997). Pursuant to Rule 702, Tenn. R. Evid., an expert may testify "in the form of an opinion or otherwise," when the "scientific, technical, or other specialized knowledge" offered by the witness will substantially assist the trier of fact. Rule 703, Tenn. R. Evid., requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002). A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. Id. at 832.

The record reflects that Mr. White had produced maps for the City of Kingsport for approximately three years. He earned a Bachelor of Science degree in Geography and took several computer cartography courses in college. Following graduation, he received additional training using specialized computer software and described for the court the process used to produce maps. He testified that this process is the accepted method for preparing maps in the scientific community. We believe the voir dire of this witness was thorough and sufficient to qualify him as an expert in the field of cartography, or map making. We conclude that the trial court did not abuse its discretion and that the evidence was sufficient to prove that the offenses occurred within 1000 feet of school property.

**C. Consecutive Sentencing**

The defendant contends that the evidence does not justify consecutive sentences. A trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that

the defendant is a "professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood." T.C.A. § 40-35-115(b)(1). The general principles of sentencing require that the length of sentence be "justly deserved in relation to the seriousness of the offense" and "be no greater than that deserved for the offense committed." State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (citing T.C.A. §§ 40-35-102(1) and -103(2)). Rule 32(c)(1), Tenn. R. Crim. P., requires that the trial court "specifically recite the reasons" behind its imposition of a consecutive sentence.

At the sentencing hearing, the trial court found the following facts supported consecutive sentencing: The defendant had one prior criminal conviction involving a large amount of cocaine in Ohio; when seeking appointment of counsel based on indigency, the defendant indicated he had not worked, had significant income, or filed tax returns since 1997; the defendant had a charge involving cocaine pending in Ohio, indicating probable cause existed to support the charge; the defendant's crimes in the present case involved a vast amount of cocaine, interstate activity, multiple defendants, in addition to a laboratory; and the defendant's drug business was a "major" operation. The trial court also noted:

> The conviction in Ohio, because of the nature and amount of drugs there, has an indication of big time dealing, and big time dealing indicates that a person who is able to require financing for travel, acquiring of drugs, buildings to conduct business in, and considering the full amount here and the high profitability of cocaine, and more so the high probability of crack cocaine, it's the opinion of the Court the defendant is a professional criminal, who's–who has knowingly devoted such parts–portions of his life to criminal acts as a major source of livelihood.

We do not agree the evidence in the record established that the defendant was a professional criminal who knowingly devoted his life to criminal acts as a major source of his livelihood for the purpose of imposing consecutive sentences under T.C.A. § 40-35-115(b)(1). The presentence report reflects that the defendant has one prior conviction of a "felony of the first degree" for "Aggravated Trafficking Sale of Cocaine" in Ohio in 1989 and that he served a sentence of five years. The defendant also has charges for possession of drugs pending in Ohio, but this criminal activity was not proper to consider and does not prove he devoted his life to criminal acts as a major source of income. The record does not reflect that he owned any real estate or personal property of value, with the exception of a vehicle. Although the defendant admitted that he had not worked since 1997, the state failed to demonstrate that any criminal activity provided a major source of income or that the defendant maintained assets of substantial value.

This court has affirmed consecutive sentences based on this criterion. We note that in most of those cases, the state proved the defendant had a substantial criminal history in addition to significant assets or income but was without legitimate employment to substantiate that income. See State v. Mickens, 123 S.W.3d 355 (Tenn. Crim. App. 2003) (holding that evidence established the

defendant was professional criminal as basis for imposing consecutive sentences whereas defendant had never had gainful employment and was the "governor" of a regional criminal gang); State v. Desirey, 909 S.W.2d 20 (Tenn. Crim. App. 1995) (affirming consecutive sentences based upon proof that the defendant had no other employment and grossed $200,000 per week from his gambling business); State v. Felix M. Leach, No. M2001-02258-CCA-R3-CD, Williamson County (Tenn. Crim. App. Nov. 15, 2002) app. denied (Tenn. March 17, 2003) (concluding that consecutive sentences were proper based on defendant having multiple convictions for drug sales dating back to when he was a juvenile and defendant's admission that his involvement in the drug trade is to provide extra weekly income of $3500); State v.Clifford Leon Farra, No. E2001-02235-CCA-R3-CD, Sullivan County (Tenn. Crim. App. Dec. 10, 2003.) app. denied (Tenn. May 10, 2004) (concluding consecutive sentencing appropriate based on defendant's tax returns showing income ranging from $0 to $5000 while defendant continued to pay for home mortgage, cars, coins, motor scooters, gun collection, and a lease on a motor home); State v. Frank Michael Vukelich, No. M1999-00618-CCA-R3-CD, Davidson County (Tenn. Crim. App. Sept. 11, 2001) app. denied (Tenn. Apr. 1, 2002) (concluding that evidence established the defendant was a professional criminal when the record indicated the defendant was a major marijuana dealer for several years and used the proceeds to partially finance his legitimate business and purchase a house and a boat); compare State v. Paul Anthony Buckner, No. M2003-01743-CCA-R3-CD, Hamilton County (Tenn. Crim. App. Feb. 25, 2004) (holding that despite defendant's numerous convictions of felony sale of drugs, two assaults, criminal trespass, possession of drug paraphernalia, malicious mischief, fraud, possession of a gambling device, three counts of driving on a revoked license, and several motor vehicle violations, the record did not indicate his criminal acts were a major source of his livelihood); State v. Jeffrey Smith, No. E2002-01147-CCA-R3-CD, Hamilton County (Tenn. Crim. App. March 18, 2003) (holding that a defendant was not a professional criminal for purposes of consecutive sentencing when the presentence report indicated only two prior convictions occurring several years beforehand).  Because the state failed to prove that the defendant committed numerous criminal acts or that any criminal acts provided a major source of his livelihood, we conclude that consecutive sentences were unwarranted.

Based on the foregoing and the record as a whole, we reverse the trial court's imposition of consecutive sentences, and we modify the defendant's sentences to twenty-four years for each felony conviction to be served concurrently with each other and with his sentences for the misdemeanor convictions.  We affirm all other judgments of the trial court.

 

_____
JOSEPH M. TIPTON, JUDGE